THOMAS E. McRAE, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. A motion was made for a continuance on the ground of the absence of two witnesses, who had been subpœnaed; there had been no call of the witnesses, and on the call being ordered by the judge, one of them came into court. The judge announced that the court would continue the ensuing week, and tendered the movant an officer with an order to send and bring the absent witness into court, which was declined by defendant:

*Held*, that it should clearly appear that the offer of the court would have been of no avail to the defendant before the verdict should be set aside on the ground of the refusal of the continuance.

2. Nor is it a ground for a new trial that the judge, in overruling the motion, remarked that the court was satisfied, from the manner of the defendant, that the motion was made for delay.

3. It is not error for the court to say, in the charge to the jury, that "the assertion of counsel as to the opinion they entertain of the effect of the evidence, however strongly asserted, is not evidence." Such a statement not only declares a correct principle, but in the present case it does not appear whether the remark was intended to apply to counsel for the state or for the defendant.

4. If the court charge the correct rule as to the credibility of witnesses, to-wit: that all witnesses are presumed to be credible unless impeached in the mode prescribed by law, and either party desires the modes of impeachment to be specified, a request should be made to that effect.

5. It is not error for the court to charge the jury, in a criminal case, that they "are judges of the law and the facts so as to enable them to apply the law to the facts; but it is the province of the court to construe the law and give it in charge, and of the jury to take the law as given and apply it to the facts as found by them, and to bring in a general verdict."

6. Though the charge of the court on a trial for murder may, in some respects, be objectionable as to that particular crime, yet if it be not so as to manslaughter, and the jury find a verdict for voluntary manslaughter, which is fully supported by the evidence, even if taken in connection with the statement of the defendant, made to the jury at the trial, the verdict should not be disturbed.

. Criminal law. Continuance. Evidence. Attorneys. Witness. Charge of court. Jury. New trial. Before Judge BARTLETT. Wilkinson Superior Court. October Term, 1873.

McRae was placed on trial for the murder of Green Porter, alleged to have been committed in August, 1871. The defendant pleaded not guilty. When the case was called, he moved for a continuance on account of the absence of two witnesses, Jacob Lassiter and Wash Baum. Upon call, the first came into court. The showing as to the latter was as follows:

He expects to be able to prove by Wash Baum, who is absent, that deceased told him, the morning after Lassiter saw him waylaying the yard of defendant, that he was there looking for defendant the night before, and intended to kill him; that the motion was not made for delay; that he will exercise all diligence in having the above named witness at the next term of this court; that the waylaying of his yard was about a week before the killing; that the present residence of Wash Baum is unknown to deponent; that the said Wash Baum has been subpœnaed, and deponent has used every effort in his power to have him present; that he does not know where he now is; that he is not absent by his procurement, and that he expects to have him here at the next term of the court; that when last heard from, a few weeks ago, he was in Macon, when he sent him word to be present at this term of the court.

The court overruled the motion, and remarked, in so doing, in the presence of the jury, that the court was satisfied, from the manner of the defendant, that the motion was made for delay.

The defendant excepted to said decision and to the accompanying remark.

The state submitted the following testimony:

HULDAH PORTER says: I know defendant; knew him in 1871; my husband is dead; defendant killed him in Wilkinson county, Georgia, on the fourth Friday in August, two

years ago; killed him with a double-barrel shot gun; I was sitting at the door at the time; deceased lived on defendant's plantation at the time of killing; defendant came by where I was sitting, went to a low place of the potato patch fence, got over and went within five potato rows of deceased; defendant said, "Green;" deceased said, "Yes, sir;" defendant said, "I told you, Green, to leave my place;" as he said that, he up with his gun and shot him; he then turned and went back; walked down the road, looked back and saw Green falling, and said, "Now, God damn you, you'll leave;" deceased was in his own potato patch; deceased had nothing in his hands, not even his pocket knife; defendant shot once with a double-barrel shot gun; defendant died immediately; did not see him breathe nor hear him speak; it is a quarter of a mile from my house to defendant's; defendant came from behind my house, not in the direction of his house; he was in the habit of going out into his plantation during the day; saw him once or twice a week; saw him that day at dinner at my house; never saw him with a gun at any other time; he walked along the road that evening; went through my yard, which is open to the road; passed within fifteen or twenty feet of me; had his gun; said nothing to me; this was near my house; potato patch was on the other side of the road from my house, a little to one side; about thirty yards from my house to where deceased was killed; there was nothing to keep me from seeing defendant; saw no one but defendant; Jinnie Boatwright was in the house that set in the potato patch; the two houses fronted each other, perhaps thirty yards apart, nearly opposite; don't know where Jinnie was; could have seen her if she had been in the door; I saw Jinnie in the yard about her house, looking over in the patch at deceased; when I raised the alarm about my husband's death, defendant was going up the road just above the house where I saw Jinnie; I saw the gun after I went to defendant's; knew it; deceased had his hands in his pockets when shot, looking for watermelons; doing nothing else; could have heard deceased if he had said anything; he had not been long in the patch; deceased had been working for defendant;

McRae *vs.* The State of Georgia.

knew of no difficulty between them; never heard of one; didn't know defendant was mad with him until he killed him; deceased was shot in the left side; defendant had his gun when he came to my house at dinner; asked where deceased was; he came that evening from behind my house; as deceased replied to defendant, he turned his side towards defendant, and defendant shot; defendant did not take his gun from his shoulder until he said what he did to deceased; deceased had no weapons; I examined him.

JINNIE BOATWRIGHT testified: Deceased was killed on Friday; defendant killed him; I saw him; was standing in the front door of my house; defendant got over the fense a few rows from deceased; stepped down to get opposite deceased to shoot him; remembers deceased saying nothing; he was standing with his hands down when he was shot; saw defendant coming down the road with his gun; went to the door to see where he was going; the house I was in was nearest the potato patch; defendant, after shooting, went up the road; saw deceased after he was killed; had no weapon in his hands or about his clothing; did not hear him say anything cross to anybody at the time he was shot; nobody was there but Huldah and me; saw deceased when he was shot; didn't hear him speak after he was shot; Huldah was sitting in her door; saw defendant get over the fense; passed alongside the fense to get in the big road; I went to see which way he was going; he soon passed my house; he often passed my house with a gun; defendant went three or four paces before he stopped, and then spoke to deceased, whom he was facing; deceased was coming into the road; he was coming on when I was standing in the door; am certain I saw them both when deceased was shot; he fell right away when shot; he said nothing; it was a little after sunset; deceased had his thumbs in his pocket when shot; did not hear him say that defendant could not make him leave there; deceased was working in the neighborhood; defendant was standing within five or six yards of deceased when he was shot; I am no kin to deceased; we were good friends; had three children by deceased; de-

fendant was about fifteen feet from the road and same distance from deceased when he was shot.

MOLLIE BAUM says: I was one hundred and fifty yards from Huldah's house when defendant passed Rildah's house with a gun on his shoulder; heard the firing; saw deceased; he was dead. Jinnie Boatwright staid in same house with deceased; when I got there no one was there but Jinnie and Huldah; never saw defendant with a gun that year, before that day.

HULDAH PORTER, recalled, says: Did not say to Mr. Cass that Jinnie Boatwright did not see the killing, and that no one but I saw it; deceased had no gun of any description at that time.

DR. A. H. CUMMING says: Saw deceased after his death; death resulted from gun-shot wound through heart; it was large; I judge it was done by shot-gun.

### EVIDENCE FOR DEFENSE.

JACOB LASSITER says: Was at defendant's a week or two before the killing; saw deceased there with what he took to be a gun, inside of defendant's yard; thinks it was a gun; it was between bed-time and midnight; defendant had just gotten up and gone into the house; deceased was standing about twelve feet from the piazza, on west end; I was lying on the east side; defendant had been lying on east side of piazza, and had gotten up and gone into the house; defendant was in the habit of lying there on the fore part of every night; his going awoke me, and I then saw deceased; when he got there he stopped long enough for me to make him out; he said nothing; I did not speak to him; I became a little doubtful of the position I was in; he went out of the gate towards where he lived; I heard deceased speak to Wash Baum that night; I followed him up there; heard no names called; heard him as he started off; deceased answered to his name; had been working for defendant, and stayed two or three weeks; defendant and I are as intimate as any man I labor for; defendant manifested no concern about sleeping in the piazza; saw

McRae *vs.* The State of Georgia.

deceased stop after he came in; he then passed towards the well forty or fifty yards off; cut around to west end of the house; he was about twenty-six feet from me; stood there about three or four minutes; I looked straight at him; think the moon was shining, not positive; uses glasses; can see as well at night as ever; deceased was dark colored; had on no coat; was barefooted; I examined tracks the next day; am satisfied they were his tracks; never measured his feet; no peculiar marks about them; was fully satisfied it was deceased from a conversation between him and defendant that morning; I watched him; defendant said to deceased, " I want you to go away from here, Green;" didn't seem angry; deceased went off mumbling; no difficulty that I knew of about work; Wash Baum is black; deceased was chunky; I could see him well enough to know who he was; might have been a stick in his hand; thought it was a gun; had it on his left arm; as he started off he threw it on his shoulders; had known deceased several years; had worked with me; I had no gun or pistol; I walked after him; there was nothing to harm me; went within thirty feet of them; Baum's house is three hundred or four hundred yards off; a tree was between defendant and me then; he had then in his hands whatever he had; couldn't see the lock; it was a mighty long stick, if a stick; I followed the man without saying anything to defendant; I was not afraid of him; could keep shade between me and him; never told defendant until after killing; deceased didn't talk like leaving that morning.

THOMAS CASS says: Was at the place the day deceased was killed; saw Huldah Porter there; it was between four and ten minutes after the gun fired; Huldah said she didn't know whether defendant or the black man killed him; said no one saw it but her; was at Burk's, and was going to Irwinton that day; Burk lives four to six miles below defendant; left Burk's after breakfast, and got home about dark; didn't come in a hurry; stopped at houses; it was a little in the night; stopped at defendant's ten or fifteen minutes, also at Hatfield's; hadn't ate dinner when at Hatfield's.

DEFENDANT'S STATEMENT: Had deceased employed for the year by the month; in July he abstracted the labor from my farm; he was under written contract for himself and hands; in August I employed two hands; he ran them off; it was impossible for me to employ labor; I had, time and time again, ordered him from my place; it was impossible to get rid of him; I employed counsel to have him removed; he was committed; gave bond and was released; I inquired by what process I should now proceed; was told to take a pole and thrash him out; I observed that he would not take a thrashing; on Friday morning took my gun and dogs as usual in going to the hands, and thought I would kill some birds, of which there were a great many. As I passed Lewis Parks' house saw deceased with his head around the corner of the house; when I went into where he resided he was in the potato patch; I walked to the fense; when he discovered me he asked me what I wanted; I asked him if I had not requested him to leave my premises several times; he said, " I will leave when I get ready." He came from the back of the potato patch; came meeting me; I said, "Green, hush! I have tried to justify this matter by law," and he approached me with his right hand in his pocket after I bade him stop, and knowing his nature and character, I shot.

The jury found the defendant guilty of voluntary manslaughter. A motion was made for a new trial upon the following grounds:

1st. Because the court erred in overruling the motion for a continuance.

In reference to this ground the presiding judge states in his certificate to the bill of exceptions, that he offered to defendant's counsel the services of a bailiff to bring the witness, Baum, into court, announcing his intention to continue the term during the succeeding week. This proposition was declined.

2d. Because the court erred in refusing to charge, "that the jurors are judges of the law as well as of the evidence, and it

is their privilege to construe both," and in charging "that the jury are the judges of the law and the facts, so as to enable them to apply the law to the facts and bring in a general verdict, but you, gentlemen, have no right to make the law; the law is laid down in the Code. It is the province of the court to construe the law and give it in charge, and of the jury to take the law as given, apply it to the facts as found by them, and bring in a general verdict."

3d. Because the court erred in refusing to charge, "that while it is the duty of the court to give in charge to the jury the law, it is the right of the jury to construe the law as well as the evidence."

4th. Because the court erred in charging as follows: "The assertions of counsel as to the opinions they may entertain, or the effect produced on the minds of counsel by the evidence, however strongly asserted, are not evidence before the jury, and should not be considered as evidence."

5th. Because the court erred in charging the jury, "that all witnesses are presumed credible and entitled to be believed, unless impeached by the modes pointed out by law," without pointing out what those modes were, it being important to the defendant that the jury should be so instructed.

6th. Because the verdict was contrary to the law and the evidence.

The motion was overruled, and defendant excepted.

F. CHAMBERS; W. A. LOFTON, by brief, for plaintiff in error.

J. W. PRESTON, solicitor general, for the state.

TRIPPE, Judge.

1. The crime of which the defendant (plaintiff in error,) stands convicted, was committed more than two years before the trial. The judge certifies that "when the case was sounded, the defendant, without having his witnesses called, moved for a continuance. The court requiring the witnesses to be

called, Jacob Lassiter and another witness came into court. The judge offered to furnish a bailiff to send and bring the absent witness, Baum, into court, having announced the intention to continue the term the following week. Defendant's counsel declined to send for the witness." The continuance was then refused. The action of the court does not leave the defendant much ground of complaint. There was no reason why he should not have accepted the offer made to send for the witness. An officer was tendered and time proposed to be given. If the witness could not have been found after the effort was thus made, a different question would have then been presented. But the refusal of the defendant to make the effort, when taken in connection with the fact that he had made the motion for a continuance on the ground of the absence of several witnesses, when all but one came into court on being called, very strongly supports the court in refusing the continuance, and relieves the refusal from the charge of being an abuse of discretion. When parties decline to avail themselves of the aids which the courts tender, for the purpose of disposing of the business before them, it should be made to clearly appear that the offer would be of no avail to the one refusing, before a verdict should be set aside, on the ground that a whole term was not given.

2. Nor do we think that the remark of the court, to-wit: that it was satisfied from what had occurred in connection with the motion, that it was made for delay, authorizes the setting aside the verdict. That was doubtless the ground on which the refusal was based, and there was strong reason for so believing. It was not error to give the reason for the judgment pronounced.

3. The assertions of counsel as to the opinion they entertain of the effect of the evidence, however strongly they may be made, are not evidence, and it is not error for the court so to say to the jury. It would be but a statement of an undeniably correct principle, and might often be a prudent warning to the jury. It is the duty of a jury to listen to the argument of counsel, but for the evidence they must look to the

McRae vs. The State of Georgia.

witnesses and the other testimony in the case.   As to the effect of the evidence, after all the light that may be thrown upon it by the argument and the charge of the court, it is to be determined by the reason and judgment of the jury.   It may be added, that so far as it appears from the record, it is not shown whether the remark complained of was intended by the court to apply to counsel for the defendant or for the state.

4.  The charge of the court as to the credibility of witnesses, to-wit: that all witnesses are presumed to be credible unless impeached in the mode prescribed by law, was correct.   If either party desire the modes of impeachment to be pointed out or specified, a request to that effect should be made.   In this case any impeaching testimony that was introduced was admitted for the purpose of impeachment, and in the mode prescribed by law.   That mode of impeachment was adopted, allowed, and was before the jury, and so understood, as one of the modes prescribed by law.   If there was anything special in the case which would have made it proper that the jury should have been particularly charged upon it as a guard against being misled, it should so be made to appear in the record, and the attention of the court should have been called to it.

5.  According to several decisions made by this court, it was not error for the court to charge, in a criminal case, that "the jury are judges of the law and the facts, so as to enable them to apply the law to the facts; but it is the province of the court to construe the law and give it in charge, and of the jury to take the law as given and apply it to the facts as found by them, and to bring in a general verdict:" *Anderson vs. The State*, 42 *Georgia*, 9; *Oneil vs. The State*, 48 *Ibid.*, 66.

6.  The indictment in this case was for murder.   The verdict was voluntary manslaughter.   A portion of the charge on the subject of murder may have been, on close criticism, in some respects objectionable.   Those portions are not given by the reporter in the statement of the case, nor is it necessary to state them here.   But no exception is taken to the charge on

the subject of manslaughter, which was also fully submitted to the jury. The verdict is strongly supported by the evidence, even if taken with the statement made by the defendant to the jury at the trial. This being so, although there might have been some error in the charge as to another crime, not found by the jury, and which could not have misled them in the verdict that was rendered, we do not think we are called upon to set aside the verdict, and to grant a new trial.

Judgment affirmed.